[Cite as *State v. Pierre*, 2025-Ohio-198.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2024-CA-35 |
| | : | |
| v. | : | Trial Court Case No. 19-CR-333 |
| | : | |
| NEPTUNE PIERRE | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 24, 2025

. . . . . . . . . . .

JOSHUA G. HOMER, Attorney for Appellant

ROBERT C. LOGSDON, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Neptune Pierre appeals from the denial of his motion to withdraw his guilty plea and vacate his conviction for failure to comply with an order or signal of a police officer ("failure to comply"), a felony of the third degree. For the following reasons, we

affirm.

### Facts and Procedural History

{¶ 2} Pierre was indicted for failure to comply on June 10, 2019, and pled not guilty. He later withdrew his not guilty plea and pled guilty to failure to comply. On September 18, 2019, he was sentenced to three years of community control sanctions.

{¶ 3} On October 4, 2023, Pierre filed a motion to withdraw his guilty plea based upon ineffective assistance of counsel. Pierre alleged that his attorney had not advised him "regarding any potential immigration consequences" to pleading guilty and had not requested a court-appointed foreign language interpreter for him. He asserted that he had been "a limited English proficient individual" at the time of his plea. According to Pierre, he was "placed in deportation proceedings" as a result of his plea and conviction. He also asserted that his plea had not been knowing, intelligent, or voluntary.

{¶ 4} Pierre attached multiple exhibits to his motion to withdraw, including his own affidavit. The affidavit asserted the following: Pierre had taken English classes in Haiti and knew some English before coming to the United States, but he was still not fluent -- "far from it." In 2015, Pierre obtained a Visa to travel to the United States. He had entered the country twice before his arrest: once for a period of 16 days, and a second time for six days. When he was stopped for failure to comply, there were three teenagers in his vehicle. Defense counsel advised Pierre that the teenagers and their parents "were ready to testify" against him and that there was a video of the traffic stop.

{¶ 5} The affidavit further stated that all the court proceedings had been in English, and Pierre had never been offered an interpreter. Despite it being evident on multiple

occasions that he was struggling to understand terms that the judge was using, the proceedings were never paused to ask if he wanted an interpreter or to check if he "truly" understood the proceedings. Because Pierre was not fully fluent in English, he did not "fully understand everything" that the judge told him.

{¶ 6} According to Pierre's affidavit, when the police initiated the traffic stop, "something in [his] mind just snapped," but defense counsel did not explain to him that that could be a potential defense at trial. He asserted that, if defense counsel had told him that pleading guilty would cause him to be deported and "block" him from temporary protected status and getting a green card through his U.S.-citizen wife, he never would have pled guilty and would have insisted on going to trial. According to Pierre, he would not have accepted any deal that would send him back where his life was in danger, even if his attorney had told him he was unlikely to win at trial. Because he did not fully understand what was happening, he decided it was best to do whatever his attorney told him, and his attorney said he would get Pierre out of jail.

{¶ 7} After a hearing on Pierre's motion to withdraw his plea, the trial court denied the motion.

{¶ 8} Before addressing Pierre's four assignments of errors, we will discuss the evidence presented at the hearing on his motion to withdraw his guilty plea and the trial court's written decision.

Hearing on Motion to Withdraw

{¶ 9} An interpreter participated in the hearing on Pierre's motion to withdraw his guilty plea. Through the interpreter, Pierre testified that he was born in 1981 in Haiti.

He spoke Creole, French, and "a little bit of English." When he entered the United States in January 2008, Pierre intended to stay for nine days for a vacation. He did not return to Haiti, however, because he received a phone call "saying that they had wanted [him] to work for the Government of Haiti," and he refused to do so. Pierre had left his car in Haiti, and he stated that in response to his refusal to work for the government, "they slashed my tires; and they told me that we start with your tires. Next time it's gonna be your life." According to Pierre, "[w]hen somebody call you and tell you that they are a member of the Government, could be a gang member and someone else." He also believed that he if he didn't do what they ordered him to do, he "would definitely be dead."

{¶ 10} Prior to his arrest, Pierre had never had any contact with law enforcement or the judicial system in the United States. When he saw the police behind him with lights and siren activated, Pierre was aware that, in Haiti, if the police stop a person, "there's a good chance that [the person] might never go back home"; this is what was going through his mind when he got stopped.

{¶ 11} Pierre was arrested on May 30, 2019. He hired Attorney John Juergens to represent him after obtaining Juergens's phone number from an inmate in jail and giving it to his sister, who contacted Juergens. According to his testimony, he thereafter appeared before a judge three times. Attorney Juergens spoke neither French nor Creole, and Pierre had not communicated with him prior to his first appearance in court. The first hearing was conducted in English, and an interpreter was not offered or requested by Pierre. Pierre testified at the plea withdrawal hearing that he had not understood what the judge was saying, but when the judge asked him for his name and

address, he was able to understand. The court asked no further questions. The hearing lasted five to seven minutes.

{¶ 12} A few weeks before his next hearing, Pierre met with his attorney. He testified that he did not understand most of what his attorney told him and, specifically, did not understand what a felony was. He also did not realize that a felony was a "big deal" or its significance. He was focused on trying to get probation. But he stated that his attorney knew he was not a U.S. citizen because Pierre's cousin had shown the attorney a copy of Pierre's passport, and the attorney acknowledged having seen it. Pierre did not talk with his attorney about his immigration status. Pierre testified that defense counsel had not discussed with him the effect of his plea on his ability to remain in the U.S. and that he would not have entered his plea if he had "known about the effect of [his] status." Pierre did not ask anything about his immigration status because he did not know "how to say or do certain things." When asked why he did not advise defense counsel that he did not understand his situation, Pierre responded that defense counsel was "not somebody that I talk, you know, often with."

{¶ 13} According to Pierre, defense counsel told him that, if he went to trial, "the other party would come to the court and they have videos and evidence of whatever happened . . . ," which would "not be a good thing" for his case. Pierre understood that defense counsel was advising him to accept the offer of probation. Defense counsel did not discuss fighting the charges, that Pierre had the right to cross-examine the State's witnesses, or that the State had to prove every element of failure to comply beyond a reasonable doubt. According to Pierre, defense counsel never advised him that the

State would have to prove that Pierre knew what he was doing at the time of the offense or that the State may have difficulty doing so given Pierre's experience with police in Haiti. According to Pierre, if counsel had done so, Pierre "never would have accepted the plea the way [he] did."

{¶ 14} After meeting with his attorney at the jail, Pierre tried to reach him by phone but there was no answer. At his second hearing, he got "a bail bond," but he was not released; he had been given a paper in jail "saying that they gonna keep me for ICE, immigration."

{¶ 15} At his third hearing, which again was conducted in English with no interpreter, Pierre accepted the plea offer, and his attorney told him that he was going to get probation. However, Pierre didn't understand most of what the judge said because he didn't "speak English that much." The hearing lasted 20 to 25 minutes.

{¶ 16} Pierre's attorney at the plea withdrawal hearing noted that the transcript of the plea hearing reflected that the court had asked repeatedly if Pierre understood the proceedings, and Pierre had responded affirmatively. Pierre asserted that he "didn't want to stop the Judge" and wanted "to finish . . . ." He admitted that he had said yes every time the judge asked him something in order to get probation. Pierre acknowledged that when asked by the court if anyone had coerced him into taking the plea offer, he responded affirmatively. According to Pierre, "the main reason why I said yes is my lawyer told me that if I don't take the deal, there's a good chance I will go to prison. So I didn't want to go to prison, so I said yes." Pierre clarified that no one forced him to take the plea, but he reiterated that he had not understood what the judge was

saying and "just said yes." Pierre acknowledged that the court paused the proceedings upon his affirmative response about being coerced, at which point his attorney told him "to say no this time," so he did.

{¶ 17} The following exchange occurred at the hearing on the motion to withdraw:

Q. At any time during this, did you ever tell the Judge that you didn't understand what was happening?

A. Yes.

Q. And when you told the Judge that you weren't understanding, what, if anything, did the Judge do?

A. We had to stop for you know, a few minutes and then continue.

Q. Did the Judge ask why you weren't understanding?

A. No.

{¶ 18} When asked about the sentencing hearing, Pierre denied that he had been present for it, stating "Maybe my lawyer went by himself." Pierre acknowledged that he had spoken to probation officers in English prior to sentencing, and he indicated that he understood "that basic of English."

{¶ 19} Pierre spent 120 days in jail before "the ICE officer" picked him up. He retained a new lawyer to represent him in the immigration proceedings, Paul Shonk. Pierre was denied bond and applied for asylum. Attorney Shonk did not tell him that his conviction would affect his asylum application, and the application was denied because it "came too late." Pierre appealed that decision, and his appeal was denied.

{¶ 20} Pierre later attempted to apply for temporary protection status (TPS) with

yet another lawyer. His application was denied in March or April 2023 because of his felony conviction. His attorney in the TPS matter did not discuss the possibility of "undoing" his conviction due to defense counsel's failure to advise him about the immigration consequences, but he did refer Pierre to another attorney, who represented Pierre at the hearing on the motion to withdraw.

{¶ 21} Pierre testified that, when his TPS application was denied, he understood for the first time that his conviction had potential consequences for his immigration status, because they sent him "a notification that said that that is the reason why [his] application was denied." Pierre stated that his wife, a United States citizen, also applied for legal status for him and was denied.

{¶ 22} Pierre and his wife subsequently divorced, and Pierre remarried. His second wife was also a U.S. citizen. She requested legal immigration status for Pierre, but he was not able to obtain a green card because of his criminal record.

{¶ 23} Pierre stated that he "would go to prison" if that would help him "straighten up" his immigration status; he "would have preferred to go to prison ten times than being in probation" if doing so meant he could "fix up [his] status." He did not want to go back to Haiti because he believed he "might get killed" there.

{¶ 24} On cross-examination, Pierre acknowledged speaking to probation officers Laura Watkins and Tim Howdyshell. He read from the presentence investigation (PSI) questionnaire, completed in writing he identified as his own, which said: "I was driving my cousin's neighbors car to Walmart on the way there the Police got behind me an[d] signal me to stop I didn't not hear or see them because the music. When I seen them I got

scared and ran."

{¶ 25} On redirect examination, Pierre noted that his English proficiency had increased since his arrest.

{¶ 26} Laura Watkins, a probation officer with the Clark County Adult Probation Department, attended Pierre's plea hearing and was assigned to complete his PSI. She described the PSI process, which included providing Pierre with the presentence questionnaire and conducting an interview. Pierre was given the questionnaire in court, and she completed the interview at the jail.

{¶ 27} Watkins took notes from the interview on the questionnaire. She identified her writing and Pierre's on the questionnaire which, per her practice, were in different-colored ink. Watkins's notes stated:

Defendant stated he didn't pull over because he was scared because first time being pulled over by police. After crash, he ran because he was still scared. He said he was scared, doesn't remember pushing the officer or grab [sic] him. Defendant stated he ran with the cuffs on. Defendant stated he ran because he was afraid, said he didn't push officer. Visa was issued in 2015 to come to the United States. He has been here four times with a visa. . . . Said has ICE detainer because he stayed longer than the six-month period of time . . . Defendant thought he could stay because of marriage. So he should have left in July of 2018, was scheduled to be fingerprinted in South Carolina on August of 2019 but was in the Clark County Jail.

{¶ 28} Watkins obtained the above information directly from Pierre without the use of an interpreter. She was able to communicate with him effectively during the process. On cross-examination, Watkins stated that she met with Pierre once for about 45 minutes. He filled out the questionnaire outside of her presence.

{¶ 29} Probation Officer Timothy Howdyshell of the Clark County Adult Probation Department testified that he had been assigned to supervise Pierre. During that time, Pierre was required to contact Howdyshell by phone "due to living in Columbus, detained, like the ICE situation and COVID." Howdyshell met with Pierre one time in the Clark County Jail to review the rules of probation. He had no concerns that Pierre did not understand the rules or their conversations. Howdyshell did not use an interpreter during his supervision of Pierre's probation.

{¶ 30} On cross-examination, Howdyshell acknowledged that Deputy Eubanks had noted in his arrest report that Pierre was Haitian, "didn't speak much English," and was "very hard to understand because he didn't speak English very well." Howdyshell further acknowledged that the arrest report stated that Pierre was also "unable to provide" how long he had been in the United States and advised the officer that he spoke French Creole. Despite the representations in the report, Howdyshell did not obtain an interpreter for Pierre.

The Trial Court's Decision

{¶ 31} At the conclusion of the hearing, the trial court noted that Pierre was required to show both that defense counsel's performance had been deficient and that there was a reasonable probability that, but for counsel's error, he (Pierre) would not have

entered a guilty plea in this matter, referencing *Strickland v. Washington*, 466 U.S. 668 (1984). The court also referenced Pierre's signed plea form, which acknowledged his understanding of the consequences of a conviction as a non-citizen of the United States. The court also stated that Pierre had signed a copy of the rules of probation, and that Howdyshell had testified that he had been able to communicate with Pierre with "no issue . . . other than just at some point he had to ask for clarification just to make sure he understood what was said."

{¶ 32} In denying the motion, the court reasoned that Attorney Juergens, who represented Pierre at the plea hearing, had been retained by Pierre and was presumed to have been competent. The court considered the plea colloquy. The court quoted its advisement regarding potential deportation consequences and noted that Pierre had indicated he understood. The court further noted that Pierre had not simply answered yes to all questions; he had seemed to understand and answered yes to some questions and no to others. Moreover, Pierre had acknowledged reviewing the matter and his plea form with defense counsel and had expressed satisfaction with counsel's representation. The trial court stated that Pierre had acknowledged his constitutional rights and that defense counsel had acknowledged Pierre's understanding.

{¶ 33} In its written decision, the trial court concluded:

The Court again notes that it is on the Defense to show that there was a manifest injustice in order for this court to withdraw the defendant's post disposition plea. The Court finds as follows:

-That counsel for the defendant was hired counsel. Attorney

Juergens has practiced in the Courts of Clark County since 1986 and is in good standing with the Ohio Supreme Court. The Court finds that at all hearings Attorney Juergens was present and available [as] counsel for the defendant.

-The Court further finds that during the plea colloquy the defendant answered appropriately to the questions being posed by the Court: This included questions about his citizenship and the effects of a guilty plea. This language was also included in the plea form, which the defendant admitted to reviewing and understanding.

-The Court further finds that [throughout] the PSI completion process that probation officers were able to communicate with defendant without the use of an interpreter and it was their belief that the defendant understood their communication.

The Court THEREFORE finds that Counsel's performance was not deficient.

In addition, even had counsel's performance been deficient, the court FINDS that there isn't reasonable probability that [the] defendant would not have plead guilty but for his attorney's performance.

The Court finds that the defendant's testimony was that he wanted to get probation and not go to prison. This plea accomplished the defendant's stated goals when he initially met with Attorney Juergens.

{¶ 34} Pierre asserts four assignments of error on appeal. We will consider his

first and second assignments of error together.   They are as follows:

THE TRIAL COURT ERRED BY HOLDING THAT DEFENDANT'S CRIMINAL DEFENSE COUNSEL'S PERFORMANCE WAS NOT DEFICIENT WHEN HIS CRIMINAL DEFENSE ATTORNEY DID NOT ADVISE HIM OF THE CERTAIN IMMIGRATION CONSEQUENCES OF HIS PLEADING GUILTY TO THE FELONY OFFENSE.

THE TRIAL COURT ERRED BY HOLDING THAT EVEN IF DEFENDANT'S CRIMINAL DEFENSE COUNSEL'S PERFORMANCE WAS DEFICIENT, SUCH DEFICIENT PERFORMANCE DID NOT PREJUDICE DEFENDANT AS HE DID NOT SHOW THAT BUT FOR COUNSEL'S ERROR, HE WOULD NOT HAVE PLEADED GUILTY.

**{¶ 35}** In his first assignment of error, Pierre asserts that defense counsel must accurately advise non-citizen clients of the immigration consequences resulting from a guilty plea when the consequences can be clearly determined, and if the risk of adverse consequences is unclear, defense counsel must warn of the risk of adverse consequences.   He asserts that inaccurate advice or no advice at all demonstrates ineffective assistance of counsel if the non-citizen is prejudiced.

**{¶ 36}** Pierre argues that a court's advisement to a non-citizen defendant that a guilty plea may result in immigration consequences does not relieve defense counsel of the obligation to do so.   He asserts that whether or not a plea was entered knowingly and voluntarily is not the correct analysis to address a claim of ineffective assistance of counsel.

{¶ 37} According to Pierre, the offense of failure to comply is "highly likely" to be determined to be a crime involving moral turpitude since "willfully" is the "scienter required," and a substantial risk of serious physical harm to persons or property must also be proven. Pierre acknowledges, however, that he "has found no court or agency decision" declaring failure to comply to be a crime of moral turpitude pursuant to 8 U.S.C. 1182(a)(2)(A)(i)(I).

{¶ 38} In his second assignment of error, Pierre argues that defense counsel's performance was deficient due to his unequivocal advice to plead guilty to an offense with "a high likelihood of triggering automatic deportation." Pierre notes that while "judicial advisements may be considered when assessing prejudice, it is not the only factor that must be considered; the totality of the circumstances must still be considered." He argues that, if he had been accurately advised, he would not have pled guilty and would have insisted on going to trial, because his life was at risk if he had to go back to Haiti. He asserts that his plea, entered in reliance upon defense counsel's advice, "directly resulted in his being placed in removal proceedings."

{¶ 39} In response to Pierre's first two assignments of error, the State argues that Pierre does not set forth the relevant standards of review for an appellate court assessing a trial court's decision on a motion to withdraw a guilty plea due to ineffective assistance of counsel, citing Crim.R. 32.1. According to the State, there are many cases that hold that, even if counsel was deficient in advising of potential immigration consequences resulting from a guilty plea, the trial court can cure any prejudice by properly advising a defendant of those consequences. The State asserts that the record does not

independently establish that Pierre was never advised by his trial counsel of potential immigration issues and, in the absence of evidence beyond his own assertions, Pierre "cannot establish that his trial counsel was ineffective." Finally, the State asserts that because Pierre failed to satisfy both *Strickland* prongs, he cannot establish that a manifest injustice occurred, and therefore the trial court did not abuse its discretion in denying the motion to withdraw the guilty plea.

Motion to Withdraw a Plea

{¶ 40} Pursuant to Crim.R. 32.1, a "motion to withdraw a plea of guilty or no contest may be made only before sentence is imposed; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his or her plea." "The burden to prove the existence of a manifest injustice rests upon the defendant and demands a showing of extraordinary circumstances." *State v. Woodfork,* 2024-Ohio-2555, ¶ 17 (2d Dist.), citing *State v. Smith*, 49 Ohio St.2d 261, 264 (1977); *State v. Turner*, 2007-Ohio-1346, ¶ 20 (2d Dist.).

{¶ 41} "Appellate courts review a trial court's ruling on a motion to withdraw a guilty plea for abuse of discretion." *State v. Gilbreath*, 2022-Ohio-3759, ¶ 8 (2d Dist.) citing *State v. Rozell*, 2018-Ohio-1722, ¶ 25 (2d Dist.), citing *State v. Smith*, 49 Ohio St.2d 261, 264 (1977), paragraph two of the syllabus. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary.' " (Citation omitted.) *State v. Darmond*, 2013-Ohio-966, ¶ 34. Most instances of abuse of discretion occur when a trial court makes a decision that is unreasonable. *Gilbreath* at ¶ 8, citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157,

161, (1990). " 'A decision is unreasonable if there is no sound reasoning process that would support that decision.' " *Id.,* quoting *AAAA Ents.* " 'Absent an abuse of discretion on the part of the trial court . . . , its decision must be affirmed.' " *State v. Ogletree*, 2014-Ohio-3431, ¶ 11 (2d Dist.), quoting *State v. Xie*, 62 Ohio St.3d 521, 527 (1992).

Ineffective Assistance of Counsel

{¶ 42} "Before deciding whether to plead guilty, a defendant is entitled to 'the effective assistance of competent counsel.' " *Padilla v. Kentucky,* 559 U.S. 356, 364 (2010), quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970); *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "Under *Strickland*, we first determine whether counsel's representation 'fell below an objective standard of reasonableness.' " *Id.* at 366, quoting *Strickland* at 688. "Then we ask whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.*, quoting *Strickland* at 694. "The defendant bears the burden of proof on both prongs because a properly licensed attorney is presumed competent in Ohio." *State v. Lundberg*, 2002 WL 506439, *3 (2d Dist. April 5, 2002).

{¶ 43} The parties cite several cases involving deportation as a factor in entering a guilty plea. In *Padilla*, the Honduran appellant had been a lawful permanent resident of the United States for over 40 years and, as a member of the Armed Forces, he had served in Vietnam. *Padilla* at 359. He pled guilty to drug charges involving the transportation of marijuana in his tractor-trailer in Kentucky. *Id.* Padilla was advised by counsel that he " 'did not have to worry about immigration status since he had been in the country so long.' " *Id.* After Padilla entered a guilty plea in reliance on counsel's

advice, which "made his deportation virtually mandatory," he asserted that he would have insisted on going to trial if he had not received incorrect advice from his attorney. *Id.* Padilla was denied post-conviction relief without an evidentiary hearing. *Id.*

{¶ 44} *Padilla* granted certiorari "to decide whether, as a matter of federal law, Padilla's counsel had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country." *Id.* at 360. The U.S. Supreme Court agreed with Padilla "that constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation." *Id.*

{¶ 45} *Padilla* held that, "[b]ecause counsel must inform a client whether his plea carries a risk of deportation, Padilla has sufficiently alleged that his counsel was constitutionally deficient." *Id.* at syllabus. The Court noted that, "[b]ecause the drastic measure of deportation or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes, the importance of accurate legal advice for noncitizens accused of crimes has never been more important." *Id.* Accordingly, "as a matter of federal law, deportation is an integral part of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." *Id.*

{¶ 46} *Padilla* further noted that there will undoubtedly be numerous situations in which the deportation consequences of a plea are unclear, and the duty of counsel in such cases is more limited. *Id.* at 369. "When the law is not succinct and straightforward . . . , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry adverse immigration consequences." *Id.*

However, when the consequence of deportation is "truly clear," as it was in *Padilla*, "the duty to give correct advice is equally clear." *Id.*

{¶ 47} It was significant to the Court in *Padilla* that the terms of the relevant immigration statute were "succinct, clear, and explicit" in requiring deportation for a controlled substances conviction; as such, Padilla's attorney could have easily determined the consequence by reading the statute, and his advice was incorrect. *Id.* at 368. Accordingly, the Court determined that Padilla had satisfied the first prong of *Strickland*. *Id.* at 369. Whether Padilla was entitled to relief depended on whether he could demonstrate prejudice, but the Court did not address this question because the lower courts had not addressed it. *Id.* at 374.

{¶ 48} The State cites *State v. Cardenas*, 2016-Ohio-5537 (2d Dist.), in support of its position. Cardenas pled guilty to two fourth-degree-felony drug trafficking charges in May 2011; the following month he was advised by the Department of Homeland Security (DHS) that he could be deported. He filed a motion to withdraw his pleas in 2015. *Id.* at ¶ 4-5, 34. Cardenas had been a lawful permanent resident of the United States since 1989, and his wife and three children were U.S. citizens who had lived in Darke County since 2006. *Id.* at ¶ 2. Cardenas's former attorney stated in an affidavit in support of the motion that he had failed to advise Cardenas that he could be subject to deportation and testified that he had told Cardenas he would not be deported as a result of his status as a lawful, permanent resident. *Id.* at ¶ 40. We concluded that defense counsel had provided ineffective assistance. *Id.*

{¶ 49} We noted that, in the specific context of defense counsel's having failed to

advise a defendant of the potential immigration consequences of entering a plea, the United States Supreme Court "has held that a defendant demonstrates prejudice by convincing 'the court that a decision to reject the plea bargain would have been rational under the circumstances.' " *Id.* at ¶ 41, quoting *Padilla* at 372. In conducting "the rationality analysis," we considered the following factors:

> (1) whether the timing of the defendant's motion to withdraw plea bolsters his assertion that he would not have entered the plea had he received competent advice from counsel; (2) whether a guilty plea automatically subjects the defendant to deportation, thus making it rational for a defendant to take his chances at trial rather than subject himself to automatic deportation; and (3) the likeliness of a favorable outcome at trial had the defendant not pled guilty, as it would not be rational for a defendant to forgo a plea bargain and go to trial if a defendant faces overwhelming evidence of his guilt.

*Id.* at ¶ 42, citing *State v. Galdamez*, 2015-Ohio-3681, ¶ 37-42 (10th Dist.)

**{¶ 50}** Applying these factors, we found the delay in Cardenas's filing his motion to withdraw to be unreasonable. *Id.* at ¶ 43. As to the second factor, we concluded that Cardenas, "a lawful, permanent resident of the United States for 27 years with a wife and three children who are all United States citizens, would likely have taken his chance at trial rather than risk the high likelihood of being deported and separated from his family," a fact averred by Cardenas. *Id.* at ¶ 47. We also found that it would have been rational for Cardenas to reject the plea offer had he known he would likely be deported once

convicted. *Id.*

{¶ 51} Regarding the third factor, based upon evidence in the record, we found that it was reasonable to assume that the State had had a strong case against Cardenas, and there was nothing in the record indicating that Cardenas had a defense to the trafficking charge. We concluded that a favorable outcome at trial would have been "highly unlikely," thus making a decision to reject a plea agreement irrational. *Id.* at ¶ 48.

{¶ 52} Finally, we observed that, although Ohio courts had previously held that a trial court's proper advisement under R.C. 2943.031 cured the prejudice resulting from an attorney's deficient performance, more recently, Ohio and federal courts had "begun to back away from that principle and [hold] that a proper advisement *may* preclude a finding of prejudice." (Emphasis added; citation omitted.) *Id.* at ¶ 49. It was significant to this Court that Cardenas acknowledged the trial court's compliance with R.C. 2943.031(A), "and while not determinative, this fact weighs against a finding of prejudice." *Id.*

{¶ 53} Thus, *Cardenas* held that "the trial court did not err in finding no miscarriage of justice with respect to Cardenas's ineffective assistance of counsel claim." *Id.* at ¶ 50. We found that the unreasonable delay in filing his motion to withdraw guilty plea, the unlikelihood of success at trial, and Cardenas's professed understanding of the trial court's substantially compliant R.C. 2943.031 advisement did not support his claim that he would not have accepted the plea agreement and entered a guilty plea had he been advised that deportation was a possibility. *Id.* at ¶ 51. It was most significant that Cardenas did not seek to withdraw his plea within a reasonable time after he was notified by DHS that he was subject to deportation. *Id.*

{¶ 54} *Lee v. United States*, 582 U.S. 357 (2017), involved a lawful permanent resident who, at the time of his plea, had lived in the United States for nearly three decades, had established two businesses in Tennessee, and was the only family member in the United States who could care for his elderly parents, who were both naturalized American citizens. *Id.* at 370. There was no indication that Lee had any ties to his native South Korea. *Id.* He pled guilty to what qualified as an aggravated felony under the Immigration and Nationality Act. A noncitizen convicted of such an offense was subject to mandatory deportation. *Id.* at 361-62. Lee's attorney erroneously advised him that a conviction would not affect his status as a lawful permanent resident. *Id.* at 360. Lee and his counsel testified at an evidentiary hearing that deportation was of primary and determinative importance in Lee's decision whether to accept the plea. *Id.* at 362.

{¶ 55} *Lee* noted that, "when a defendant claims that his counsel's deficient performance deprived him of a trial by causing him to accept a plea, the defendant can show prejudice by demonstrating a 'reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.' " *Id.* at 364-65, citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Lee argued that he could establish prejudice under *Hill* because he never would have accepted a guilty plea had he known that he would be deported as a result; he insisted he would have "gambled" on a trial, risking more jail time for whatever small chance there might have been of an acquittal that would let him remain in the United States. *Id.* at 366.

{¶ 56} The Supreme Court indicated in *Lee* that it rejected adopting a per se rule

that "a defendant with no viable defense cannot show prejudice from the denial of his right to trial," as the Government suggested, because doing so overlooked the inquiry it had prescribed in *Hill,* which focused on a defendant's decision-making and may not "turn solely on the likelihood of conviction after trial." *Id.* at 367. It was significant in *Lee* that the defendant had alleged "that avoiding deportation was *the* determinative factor for him; deportation after some time in prison was not meaningfully different from deportation after somewhat less time," and that he would have rejected any plea leading to deportation – even for lesser prison time – in favor of "throwing a 'Hail Mary' at trial." *Id.* at 367-68.

{¶ 57} At Lee's plea colloquy, when the judge warned him that a conviction could result in deportation and asked is that affected Lee's decision to plead guilty, Lee answered affirmatively. *Id.* at 369. The judge then asked how it affected his decision, and Lee responded that he didn't understand and turned to his attorney for advice. *Id.* "Only when Lee's counsel assured him that the judge's statement was a 'standard warning' was Lee willing to proceed to plead guilty." *Id.* The Supreme Court concluded in *Lee* that Lee's claim that he would not have accepted a plea had he known it would lead to deportation was backed by "substantial and uncontroverted evidence." *Id.* at 371.

{¶ 58} Finally, *State v. Romero,* 2019-Ohio-1839, involved a noncitizen defendant from Honduras who was a lawful permanent resident of the United States and pled guilty to drug offenses. The trial court denied Romero's motion to withdraw his pleas, but the Fifth District reversed, and the State appealed the appellate decision. *Id.* at ¶ 2. The Ohio Supreme Court affirmed the Fifth District and remanded the matter to the trial court to apply the proper analysis established in *Strickland* and applied in *Padilla*. *Id.* at ¶ 3.

{¶ 59} At his plea hearing, the trial court had advised Romero of the immigration consequences if he pled guilty and ascertained his understanding. *Id.* at ¶ 6. Romero was subsequently detained by ICE, and he filed an emergency motion to withdraw his pleas. *Id.* at ¶ 10. He argued ineffective assistance of counsel because his attorney had failed to advise him of the immigration consequences of his plea. *Id.* It was significant to the trial court that it had advised Romero pursuant to R.C. 2943.031(A) of the possibility of deportation and that Romero had understood the deportation consequences and chosen to plead guilty. The court further found that Romero's pleas had been knowing, intelligent, and voluntary. *Id.* at ¶ 17.

{¶ 60} The Ohio Supreme Court determined that the Fifth District had not examined Romero's ineffective-assistance claim under either prong of *Strickland* and that the trial court's advisement under R.C. 2943.031(A) "does not cure an attorney's failure to advise his client of the immigration consequences of a guilty plea." *Id.* at ¶ 19. The court further found that, although judicial advisements may be relevant to a determination of prejudice under the second prong of *Strickland,* the trial court must first examine whether defense counsel fulfilled his duty under the Sixth Amendment to inform his client whether his guilty pleas carry a risk of deportation. *Id.* at 21, citing *Padilla* at 374. The Supreme Court in *Romero* concluded that, because the trial court had failed to examine whether counsel fulfilled his duty to advise and, instead, had relied on its own advisement and Crim.R. 11 to deny the motion to withdraw, the trial court had abused its discretion.

{¶ 61} Under the prejudice prong, *Romero* noted that, in assessing whether it would be rational for a defendant to go to trial instead of pleading guilty, the court should

consider the totality of the circumstances. *Id.* at ¶ 29, citing *Lee.* Citing *Lee* and *Cardenas* (evaluating prejudice before *Lee*), *Romero* listed "factors relevant to the reasonableness of the defendant's decisionmaking," including the consequences of going to trial, the importance that the defendant placed on avoiding deportation, the defendant's connections to the United States, and judicial advisement of immigration consequences. *Id.* at ¶ 29-33.

**{¶ 62}** Regarding the consequences of going to trial, the court noted that a defendant need not show that he would have been better off going to trial, and the reasonableness inquiry focuses on the defendant's perspective. *Id*. at ¶ 30, citing *Lee.* The court noted that, while "a defendant without any viable defense 'will rarely be able to show prejudice' from accepting a plea agreement, the United States Supreme Court declined to adopt a '*per se* rule' that a defendant with no viable defense at trial cannot show prejudice," and " 'even the smallest chance of success at trial may look attractive.' " *Id.* at ¶ 30, quoting *Lee*.

**{¶ 63}** Regarding the importance that the defendant placed on deportation, *Romero* considered that *Lee* noted that the defendant had repeatedly asked his attorney about the risk of deportation, which showed that deportation was the determinative issue in his decision whether to accept a plea deal. *Id*. at ¶ 31. *Romero* further noted that a defendant with strong connections and significant familial ties to the United States "would reasonably risk going to trial instead of pleading guilty and facing deportation." *Id*. at ¶ 32, citing *Lee.* Finally, *Romero* reiterated that a court's advisement of immigration consequences "does not cure counsel's deficient performance under the first *Strickland*

prong.   But a judicial advisement about the immigration consequences of the defendant's plea may weigh against a finding of prejudice."   *Id.* at ¶ 33.

Analysis

**{¶ 64}** "Any alien who is convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C. 1227(a)(2)(A)(iii). "8 U.S.C. 1228(c) creates a 'presumption of deportability,' providing: 'An alien convicted of an aggravated felony shall be conclusively presumed to be deportable from the United States.' "   *State v. Kurdi*, 2022-Ohio-4459, ¶ 19 (11th Dist.).   Thus, if Pierre's conviction is an "aggravated felony," "the Attorney General has no discretion to cancel [his] removal."   *Id.*

**{¶ 65}** An aggravated felony is defined to include "an offense relating to obstruction of justice . . . for which the term of imprisonment is at least one year."   8 U.S.C. 1101(aa)(43)(S). Pierre pled guilty to failure to comply in violation of R.C. 2921.331(B) and (C)(5).   R.C. Chapter 2921 proscribes offenses against justice and public administration, and the failure-to-comply statute is grouped with those statutes proscribing obstruction and escape.   For a third-degree felony failure to comply offense, the sentence is 12 months to 60 months if R.C. 2921.331(C)(5) applies, which it does here.   R.C. 2929.14(A)(3)(a).

**{¶ 66}** The statutes are clear that Pierre's offense constituted an "aggravated felony" mandating his deportation.   Therefore, in negotiating Pierre's guilty plea, defense counsel was required to determine and to accurately advise him that a conviction upon his plea mandated deportation.

**{¶ 67}** Significantly, defense counsel did not testify or provide an affidavit regarding

his representation. The State correctly points out that there is no evidence that independently establishes Pierre's assertion that defense counsel failed to advise him regarding possible deportation, as in *Padilla, Cardenas,* and *Lee.* As noted above, defense counsel is presumed to be competent.

{¶ 68} Even if we assume, however, that counsel acted deficiently in failing to advise Pierre of the immigration consequences of his plea and that Pierre therefore satisfied the first prong of *Strickland,* we cannot conclude that prejudice was demonstrated to satisfy the second prong. Regarding the consequences of proceeding to trial (and potentially facing a sentence of up to five years), Pierre testified that defense counsel advised him that the State had video evidence of his offense and, in his affidavit, he stated that Attorney Juergens had advised him that his three teenage passengers and their parents "were ready to testify" against him. The probable cause affidavit attached to Pierre's presentence investigation report (PSI) noted that Pierre was driving 68 miles per hour in a 35 mile per hour zone when first observed by the police. After a pursuit, the vehicle left the road and crashed into an embankment, and Pierre fled on foot. When he was finally caught, Pierre resisted arrest despite commands by the police to comply, and he again fled on foot before finally being taken into custody. Thus, the record suggests a strong case against Pierre, as in *Cardenas.* Although Pierre asserts that he had a defense in that he "snapped" because of his experience with law enforcement in Haiti, he has not identified any legal defense, and we conclude that such an assertion is speculative.

{¶ 69} Regarding the importance Pierre placed on avoiding deportation, he

testified that at the time of his plea, getting probation was his priority, a priority he repeatedly reiterated at the hearing on the motion to withdraw his plea. Put differently, there was no indication that avoiding deportation was *the* determinative factor to Pierre, as it was in *Lee.* Pierre testified that he was notified of the ICE detainer prior to entering his August 12, 2019 guilty plea, and the PSI reflected that the detainer was placed on Pierre on June 3, 2019, two days after the offense. Pierre's assertion that he was unaware of any deportation consequences at the time of his guilty plea was not credible.

{¶ 70} Regarding Pierre's ties to the United States, the PSI stated that he was 38 years old at the time of the offense and that he acknowledged that he should have returned to Haiti in July 2018. Pierre was unemployed and had never been employed in the United States; he was last employed in Haiti from 2012 to 2018, as an optician. Pierre resided with a cousin in Springfield. The PSI stated that Pierre had married his wife on January 19, 2019, but he did not reside with her; his wife lived with her mother in South Carolina, and Pierre felt more comfortable living in Springfield with his cousin. Pierre had one child who was six years old at the time of the PSI; his daughter resided with her mother in Haiti. Thus, Pierre had a strong tie to Haiti. Moreover, Pierre admitted that he had only intended to briefly vacation here when he arrived. Pierre's connections to the United States were not nearly as strong as those in *Padilla* (lawful permanent residency of over 40 years and military service), *Cardenas* (lawful permanent residency of over 27 years, and a wife and three children who were U.S. citizens and Darke County residents), and *Lee* (lawful permanent residency of over 30 years, two U.S. businesses, sole care provider for elderly U.S. citizen parents, and no ties to native South

Korea).

{¶ 71} Regarding the judicial advisement given to Pierre, R.C. 2943.031(A) requires a court to advise a defendant, prior to accepting a plea of guilty, and ascertain the defendant's understanding of the following: "If you are not a citizen of the United States, you are hereby advised that conviction of the offense to which you are pleading guilty (or no contest, when applicable) may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States."

{¶ 72} The plea hearing transcript reflects that, after Pierre advised the court that he was not a United States citizen at the start of the proceeding, the court stated: "Well, if you're not a citizen of the United States, you're hereby advised that a conviction for this offense to which you are pleading guilty may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." Pierre acknowledged his understanding of the court's advisement and did not ask questions, as in *Lee*. We conclude that the court complied with R.C. 2943.031(A).

{¶ 73} Pierre further acknowledged discussing his case and possible defenses with counsel and indicated his satisfaction with counsel's representation. He identified his signature on the plea form and acknowledged reading the form, reviewing it with counsel, and understanding it before signing it. Directly above his signature, the plea form stated: "I understand the consequences for a conviction upon me if I am not an U.S. citizen. I enter this plea voluntarily." Finally, Pierre entered his plea on June 3, 2019,

and did not file his motion to withdraw his plea until October 4, 2023. As in *Cardenas*, we conclude that this delay was unreasonable.

{¶ 74} Having considered the totality of the circumstances as required under the prejudice prong of *Strickland*, we conclude that the trial court did not abuse its discretion in denying Pierre's motion to withdraw his plea. Pierre failed to demonstrate a reasonable probability that, but for counsel's alleged errors, he would have insisted on going to trial. Accordingly, he failed to show prejudice. Based upon the foregoing, Pierre's first two assignments of error are overruled.

{¶ 75} Pierre's third assignment of error is as follows:

THE TRIAL COURT ERRED BY NOT MAKING SUFFICIENT FINDINGS OF FACTS AND CONCLUSIONS OF LAW REGARDING DEFENDANT'S ARGUMENT THAT HIS RIGHT TO INTERPRETATION WAS VIOLATED BY NOT HAVING A FOREIGN LANGUAGE INTERPRETER APPOINTED IN HIS CASE.

{¶ 76} R.C. 2311.14 governs the use of an interpreter in court and states: "Whenever because of a hearing, speech, or other impairment a party to or witness in a legal proceeding cannot readily understand or communicate, the court shall appoint a qualified interpreter to assist such person." Pierre never requested an interpreter prior to or during his plea hearing.

{¶ 77} In its decision, the trial court reviewed Pierre's testimony at the plea hearing, noting that Pierre responded appropriately to the questions being asked. It quoted Pierre's exchange with the court regarding his citizenship, the possible deportation

consequences, Pierre's discussion of his case and the plea form with counsel, and his understanding of the form. The court also quoted the exchange at the sentencing hearing in which Pierre acknowledged the court's advisement regarding possible deportation. The court noted that Pierre wrote his version of events in English on the PSI questionnaire, and that Pierre was able to communicate with probation officers Watkins and Howdyshell in English. Given Pierre's demonstrated proficiency in English, we conclude that the trial court made adequate findings of fact and conclusions of law regarding the alleged violation of his right to an interpreter. Pierre's third assignment of error is overruled.

{¶ 78} Pierre's fourth assignment of error is as follows:

THE TRIAL COURT ERRED BY FINDING THAT DEFENDANT DID NOT SUFFER MANIFEST INJUSTICE WITHOUT ADDRESSING DEFENDANT'S ARGUMENT THAT HIS RIGHTS WERE VIOLATED DUE TO THE TRIAL COURT NOT PROVIDING DEFENDANT A HAITIAN CREOLE INTERPRETER DURING HIS CRIMINAL PROCEEDINGS.

{¶ 79} Again, the trial court thoroughly addressed Pierre's argument regarding his alleged lack of English proficiency. And as discussed under Pierre's first and second assignments of error, we cannot conclude that the trial court's manifest injustice analysis was improper. Pierre's fourth assignment of error is overruled.

## Conclusion

{¶ 80} The trial court did not abuse its discretion in overruling Pierre's post-sentence motion to withdraw his guilty plea on the basis of ineffective assistance of

counsel.  The trial court did not fail to make appropriate findings and conclusions regarding Pierre's alleged need for an interpreter.  The judgment of the trial court is affirmed.

. . . . . . . . . . . .

EPLEY, P.J. and TUCKER, J., concur.